**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-CR-13 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| DICKSON ALORWORNU, | ) | |
| *Defendant*. | ) | July 22, 2025 |

## <u>RULING ON DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL</u>

Sarala V. Nagala, United States District Judge.

Following a jury trial, Defendant Dickson Alorwornu was found guilty of two counts of wire fraud in violation of 18 U.S.C. § 1343.  Before the Court now are Defendant's motions under Federal Rules of Criminal Procedure 29 and 33, respectively, for judgment of acquittal as to both counts and, in the alternative, for a new trial.  For the reasons described below, both motions are DENIED.

## I.      BACKGROUND

In January of 2023, a federal grand jury indicted Defendant on two counts of wire fraud, in violation of 18 U.S.C. § 1343.  Indictment, ECF No. 1.  The indictment alleged that Defendant had obtained credit card information from certain American Express account holders without their consent, provided materially false information to the University of Connecticut ("UCONN") in order to establish student accounts under nominee names "T.C." (Tammy Curry) and "B.S." (Brandon Skowronek), caused those two accounts to be funded with stolen and misappropriated credit card information, and sought refunds of those funds from UCONN to be transferred to bank accounts controlled by Defendant.  *Id.*  The indictment alleged two counts, one relating to a $500 payment to the Tammy Curry account in approximately February 2018 and another relating to a

$2,000 payment made to the Brandon Skowronek account in approximately January 2018.  *Id.*

The case ultimately proceeded to trial before a jury, but only after enduring a turbulent procedural history.  On November 27, 2023, on the eve of the first jury selection in this case, Defendant moved for dismissal of the indictment, claiming the Government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by belatedly disclosing material regarding an internal investigation of the lead investigator on the case, who had been identified as a potential defense witness.  The Court denied the motion in a bench ruling, which was later followed by a written decision.  *See United States v. Alorwornu*, No. 3:23-CR-00013-SVN, 2024 WL 1050326 (D. Conn. Mar. 11, 2024).  Separately, and unrelated to the alleged *Brady* violation, the trial was continued to May of 2024, in light of newly discovered evidence that the Government shared with defense counsel the morning after jury selection. *See* Order, ECF No. 119.

On May 27, 2024, the eve of the second jury selection in this case, the Government disclosed further information to defense counsel following a review of its files before trial.  The Court ordered the Government to make further disclosures to Defendant on May 28, 2024, *see* Order, ECF No. 163.  Ultimately, in light of those disclosures and in an abundance of caution, the Court again granted a trial continuance, over the Government's objection.  *See* Order, ECF No. 168.  Shortly thereafter, Defendant filed a second motion to dismiss the indictment pursuant to *Brady* and various discovery rules, based on alleged prosecutorial misconduct.  *See* Second Mot. to Dismiss, ECF No. 184.  The Court denied the motion to dismiss.  *United States v. Alorwornu*, No. 3:23-CR-00013-SVN, 2024 WL 4241879, at *1 (D. Conn. Sept. 19, 2024).

The Court ultimately held a jury trial in October of 2024.  At trial, after the close of the Government's case, Defendant moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29

on the grounds that the evidence presented was insufficient to sustain a conviction as to both counts. Tr.[1] at 592–94. The Court denied the motion. *Id.* at 596–98.

A central theme of the defense was that Defendant's wife, Tika Smith, could have been responsible for the fraud, rather than Defendant. After both the Government and Defendant rested their cases, the Government disclosed that it had, before the defense rested, attempted to serve a trial subpoena upon Tika Smith through an agent of the Federal Bureau of Investigation ("FBI") from New Jersey. The Court ultimately reopened the case to allow defense counsel to examine the FBI agent who attempted to serve the subpoena. *Id.* at 638–39. At the close of the agent's testimony, Defendant renewed his motion for a judgment of acquittal. *Id.* at 663. The Court again denied Defendant's motion. *Id.* at 663.

The jury found Defendant guilty of both counts of wire fraud. *See* Jury Verdict, ECF No. 252. The day after the jury rendered its verdict, Defendant filed a motion for a judgment of acquittal, and a motion for a new trial under Rules 29 and 33, respectively. ECF No. 255; *see also* ECF Nos. 274, 275 (memoranda in support of each respective motion). The Government opposes both motions. *See* Gov't Opp. Br, ECF No. 278.

## II.    RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

For the reasons described below, Defendant's motion for judgment of acquittal is denied.

### A.    Legal Standard

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the

---

[1] Transcript pages 1–243 appear at ECF No. 266 (Day One); pages 244–476 appear at ECF No. 267 (Day Two); pages 477–614 appear at ECF No. 268 (Day Three); pages 615–739 appear at ECF No. 269 (Day Four); and pages 740–796 appear at ECF No. 270 (Day Five).

evidence to support his conviction bears a heavy burden.  Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

"The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation."  *United States v. Moses*, 109 F.4th 107, 116 (2d Cir. 2024); *see also United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (noting that, in evaluating a Rule 29 motion, the evidence must be viewed "in its totality").  In making a case based on circumstantial evidence, the Government "need not exclude every reasonable hypothesis other than that of guilt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).  Moreover, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court."  *Moses*, 109 F.4th at 116.  Accordingly, the Court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *Guadagna*, 183 F.3d at 130.

B.  <u>Discussion</u>

As the Court instructed the jury, in order to find Defendant guilty of either count of wire fraud, the jury had to find beyond a reasonable doubt that (1) "there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises as alleged in the indictment"; (2) "that Mr. Alorwornu knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud," and (3) "that in the execution of that scheme, Mr. Alorwornu used or

caused use of the interstate wires." Tr. at 699–700; *see also United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019) (noting that the elements for wire fraud are that defendant "(1) had an intent to defraud, (2) engaged in a fraudulent scheme to obtain . . . money or property involving material misrepresentations . . ., and (3) used the wires to further that scheme").

Defendant contends that the Government failed to establish that (a) there was a scheme to defraud as to Count Two and (b) that Defendant knowingly participated in the scheme as to both counts.  *See* Def.'s Rule 29 Mem., ECF No. 274 at 3.  The Court therefore focuses its analysis on those two grounds.

### 1. Scheme or Artifice to Defraud as to Count Two

Count Two charged Defendant with wire fraud in connection with a $2,000 payment from January 29, 2018, from the American Express account of Rhonda Shearer to the Brandon Skowronek UCONN account.  *See* ECF No. 1.  The Government produced sufficient evidence such that a rational trier of fact could find that there was a scheme to defraud as to Count Two, beyond a reasonable doubt.

As an initial matter, the Government introduced evidence regarding the broader scheme to defraud, encompassing both counts, that the perpetrator was funding phony UCONN student accounts through credit card charges and then requesting refunds from the funded accounts.  For example, Alyse Lofman-Kwapien of the UCONN Bursar's office testified that her office had identified that credit card payments were being used to fraudulently fund the Brandon Skowronek and Tammy Curry student accounts.  Tr. at 53–54.  She offered extensive testimony explaining different indicators of potential fraud with respect to these accounts.  For instance, the office had identified that the tuition payments had been reported as fraudulent by cardholders, *see id.* at 54, that the names of the cardholders did not match the names on the student accounts, *id.*, that multiple

payments being made to the same accounts within a short time frame was "very uncommon," *id.* at 62, that it was "definitely suspicious" that the same American Express accounts were being used to make tuition payments for both the Tammy Curry and Brandon Skowronek student accounts, given that the accounts did not appear to be related by name, home address, or other identification, *id.* at 99; *see also* GX 243, and that tuition payments continued to be made even after refunds were requested, which was also "very uncommon," *see id.* at 83–84, 106–07.

And the Government provided still more evidence as to the scheme to defraud in Count Two specifically. First, the Government introduced evidence that the Brandon Skowronek UCONN student account was not created by Brandon Skowronek himself. The real Brandon Skowronek testified that he never authorized his identity to be used in connection with a student account at UCONN. *Id.* at 187.

Second, the testimony of Patricia Shannon provided significant evidence that the payments made from Rhonda Shearer's American Express account to the Brandon Skowronek UCONN account were unauthorized. As of 2018, Shannon had been Shearer's personal assistant and bookkeeper for fifteen years, including at the time of the alleged fraud. *See id.* at 156, 160, 165. Her job responsibilities included reviewing statements when they arrived, going over the statements with Shearer and, ultimately, paying the statements. *See id.* at 157. She testified that she was "absolutely completely familiar" with Shearer's finances. *Id.* In February 2018, she observed fraudulent UCONN charges on Shearer's American Express statement during her review of that statement, *id.* at 161–63. She knew Shearer was not a student at UCONN, *id.* at 165, so she consulted with Shearer about the charges, *id.* at 158, and ultimately reported the charges to the American Express fraud department, *see id.* at 163. She further testified that the charges were credited back to the account by American Express, *see id.* at 166–67. This is sufficient evidence

for a rational trier of fact to conclude that the charges in question to Shearer's account were not authorized.

Additionally, FBI Special Agent Michael Morrison's testimony provided further evidence of the existence of the scheme alleged in Count Two. This testimony included his describing a summary chart he prepared based on records provided by American Express and UCONN that identified payments from Shearer's American Express Card to the Brandon Skowronek account, and his testimony that the payment referred to in Count Two was found in Shearer's American Express statement. *See id.* at 285–86, 292–93; GX 243.

Given this evidence, a reasonable trier of fact easily could have concluded that there was a scheme to defraud—that someone caused the phony Brandon Skowronek UCONN student account to be funded with unauthorized American Express charges from Rhonda Shearer's account so that someone could then request a refund of the monies from the student account.

Defendant's counterarguments are to no avail. He argues that the Government failed to prove that the payment from Shearer's account was unauthorized, in part because the Government did not call Shearer herself to testify. This argument is fundamentally flawed in that it contends that the Government was required to meet its burden by introducing a particular type of evidence. The Government was under no such obligation. *See Guadagna*, 183 F.3d at 130 (concluding that the Government "need not exclude every reasonable hypothesis other than that of guilt"). Defendant's other attempts to cast doubt on the credibility of Shannon's testimony, by, for example, arguing she did not know the login information to Shearer's American Express account, fail to demonstrate that the Government's evidence of a scheme to defraud as to Count Two was "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* Similarly, Defendant's arguments fail to grapple with the weight and extent of Shannon's

testimony, given her extensive experience as Shearer's personal assistant and bookkeeper for fifteen years and her determination of the UCONN charges as fraudulent. And finally, Defendant's argument that "Shannon also admitted she did not know [Shearer] had granted authorization to others, such as [her] son," *see* ECF No. 274 at 5, misconstrues Shannon's testimony. Shannon was asked on cross-examination if she was aware that Shearer's son was an authorized user and Shannon responded "[n]o." Tr. at 173. This response does not make it more or less likely that Shearer's son, or anyone else, was, in fact, an unauthorized user. Thus, the answer's import to the existence of a scheme to defraud is minimal at best.

### 2. *Defendant's Knowing Participation in the Scheme or Artifice*

The Government presented enough evidence for a rational trier of fact to conclude that Defendant knowingly participated in a scheme to defraud as to both counts. Specifically, the Government introduced evidence that the refunds from the UCONN accounts made their way to Defendant and that identifiers associate Defendant with the fraud accounts.

#### a. Evidence Tracing Refunds to Defendant

Next, the Government introduced sufficient evidence to permit a rational trier of fact to reasonably conclude that the UCONN refund payments made their way to Defendant.

First, the refunds associated with the "Tammy Curry" account went to a Metabank[2] account ending in -4779. *See id.* at 81–83, 294–95. The Government then introduced evidence that the funds were moved from the Metabank account to a PayPal account, *id.* at 297–302, 318–19, that Dickson Alorwornu was identified as the subscriber of that PayPal account, *id.* at 317; GX 204, and that the funds from the Metabank account came from an individual named "Dixon Al." Tr. at 319; GX 204. The Government also introduced evidence showing two transactions of funds, first

---

[2] Metabank was also known as "AccountNow." Tr. at 296.

a $2,000 transfer and then a $2,700 transfer, from PayPal to a Woori America Bank account. Tr. at 304. The Government provided evidence of a link between the Woori account and Defendant by showing that the only transaction that occurred between these two payments from the Woori account was a payment to American Express in the name of Dixon Alorwornu. *See id.* at 307; GX 206 at 8.

Similarly, the Government offered evidence supporting the inference that the funds associated with the "Brandon Skowronek" account refund can be traced to accounts controlled by Defendant. The refunded funds were traced to a Bancorp account ending in -4209. *See* Tr. at 107–10, 324–36; GX 109, 208. The Government introduced evidence of another Bancorp account as well, one ending in -9186. *See* Tr. at 327–29; GX 209. These two Bancorp accounts shared identifiers. For example, both accounts were opened in the name of Brandon Skowronek with Skowronek's real social security number. Tr. at 326–28. Moreover, some of these shared identifiers had associations with Defendant. For example, the address associated with both accounts was 716 20th Street in Newark, New Jersey. *Id.* at 326–28. This was an address that Defendant included in United States immigration paperwork that he completed. *See id.*

Further evidence also linked the -9186 account specifically to Defendant. Records showed that four payments were made from the -9186 account to the New York Institute of Technology ("NYIT") in 2015, pre-dating the events alleged in the indictment, and that those payments had been credited to Dickson Alorwornu's NYIT account. *Id.* at 328–33; GX 210–11.

Additionally, the Government introduced evidence that Defendant had a Citibank account in his name, *see* Tr. at 339–40, and that this account was repeatedly accessed by ATM at the same time and location as the Bancorp and Metabank accounts described above. For example, on January 25, 2018, a UCONN deposit of $641 to one of the Bancorp accounts was followed by two

ATM withdrawals of $123 and $503, made at an ATM at 1920 Palmer in Larchmont, New York. *See id.* at 344–47; GX 209 at 16, 39, 40; *see also* GX 242. Minutes after these withdrawals, a $620 ATM deposit at the same ATM location was made to the Citibank account associated with Defendant. *See* Tr. at 345–46; GX 217 at 31; *see also* GX 242. Similarly, on January 31, 2018, a $8,558 refund from UCONN was followed on the same day by a withdrawal of $503, which was followed within minutes by two ATM deposits to Defendant's Citibank account. *See* Tr. at 346–47; GX 201 at 5; *see also* GX 242. Both of these transactions occurred at an ATM at 1920 Palmer in Larchmont, New York. Tr. at 346–47. This location is approximately a mile and a half away from 34 Crestview Place in New Rochelle, New York, *see id.* at 347, 521, an address connected to Defendant, including by his driver's license and DMV records. *See, e.g., id.* at 320; GX 206 at 7; GX 244. Although Defendant contends that the lack of surveillance footage from these ATM transactions is fatal to the Government's case, the Court disagrees. Viewing the evidence in the light most favorable to the Government, a reasonable jury could have used the ATM records, particularly in combination with the other evidence presented by the Government, *see Moses*, 109 F.4th at 116, to conclude that Defendant knowingly participated in the fraud scheme.

b. Other Evidence Associating Defendant with the Fraud Accounts

The Government also introduced sufficient evidence for a rational juror to conclude that Defendant controlled the two email accounts used to carry out the UCONN fraud, gwenfingers@gmail.com and bskowronek321@gmail.com ("fraud accounts").

For example, Google Pay records support the inference that the fraud accounts are connected to Defendant. The Google Pay records for gwenfingers@gmail.com identified the subscriber as "Dixon Al," and identified the subscriber's phone number as (718) 450-6486, Tr. at 381. That phone number is associated with Defendant in multiple ways, including through his

NYIT registration form, s*ee id.* at 338; GX 212, and information relating to Defendant's Discover account, *see* Tr. at 390; GX 218 at 20.  As for bskowronek321@gmail.com, Google Pay records listed 716 S. 20th Street, Newark, New Jersey, Tr. at 382, an address, as described above, that Defendant identified on immigration paperwork.

Further, the Government introduced evidence related to Internet Protocol ("IP") addresses that linked Defendant to the fraud accounts.  First, IP addresses assigned to 34 Crestview Place were used on several instances to access both fraud accounts.  *See id.* at 398–99; GX 229 (bskowronek321@gmail.com); GX 230 (gwenfingers@gmail.com).  Second, the Government presented evidence of approximately 15 instances in which IP addresses used to access the fraud accounts were used on approximately the same day to access accounts associated with Defendant, including Discover, PayPal, and Apple accounts in Defendant's name.  *See id.* at 404–406.  For example, on May 19, 2018, the bskowronek321@gmail.com account was accessed by IP address 24.189.82.108.  *See id.* at 404–05.  That same IP address was used to access Defendant's Discover account that same day.  *See id.*

In sum, the Government provided enough evidence, in totality, for a rational trier of fact to conclude that Defendant knowingly participated in the scheme to defraud.

### c.  Remaining Arguments

The Court rejects Defendant's counterarguments.  His argument boils down to a contention that Government failed to exclude the possibility that someone else, particularly Defendant's wife, Tika Smith, had accessed and controlled the fraud accounts.   But, fundamentally, the possibility that other people may have been involved in the criminal activity alleged in the indictment does not undermine the jury's conclusion that, at a minimum, Alorwornu was involved in the scheme. *United States v. Willis*, 14 F.4th 170, 181–83 (2d Cir. 2021) (concluding that, in the drug trafficking

context, "the government was not required to prove that the contraband was not subject to the control of others, because possession need not be exclusive, and the jury was not required to accept [defendant's] alternative explanation of innocence"). As the Court instructed the jury, an element of wire fraud is that Defendant participated in a scheme to defraud. Tr. at 703; *see also* Tr. at 702 (instructing the jury that, in determining whether the Government has met its burden in establishing whether there was a scheme or artifice to defraud, the Government need not "prove that Mr. Alorwornu personally originated the scheme"). Because the Government "need not exclude every reasonable hypothesis other than that of guilt," Defendant's argument fails. *Guadagna*, 183 F.3d at 130; *see also United States v. Lewis*, 62 F.4th 733, 745 (2d Cir. 2023) ("[T]he Government's proof need not exclude every possible hypothesis of innocence.") (citation omitted).

So, too, Defendant's challenges to the Government's chosen investigative techniques miss the mark. Defendant argues that the Government failed to confirm whether other individuals lived at the addresses that it attempts to connect to Defendant, failed to collect devices to cross-reference with IP address information, failed to obtain ATM video footage, and failed to record a phone call to the UCONN Bursar's office. *See* ECF No. 274 at 6–7. But the Second Circuit has made clear that "the [G]overnment has no duty to employ in the course of a single investigation all of the many weapons at its disposal," and that "failure to utilize some particular technique . . . does not tend to show that a defendant is not guilty of the crime with which he has been charged." *United States v. D'Amelio*, 565 F. App'x 61, 63 (2d Cir. 2014) (summary order) (quoting *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000)).

The Government, with the investigative means it did employ, provided sufficient evidence for a rational trier of fact to conclude that Defendant was guilty of each element of the offense. Defendant has failed to carry his "heavy burden," *Jackson*, 335 F.3d at 180, and his motion for

judgment of acquittal must be denied.

### III.     RULE 33 MOTION FOR A NEW TRIAL

For the reasons described below, the Court also denies Defendant's motion for a new trial.

Defendant argues that the Court should grant a new trial because of the Court's failure to adequately sanction the Government's failure to timely disclose information throughout this case, most recently including the failure to disclose its effort to serve a trial subpoena on Tika Smith, and because the Court erred in denying Defendant's request to cross-examine a government witness concerning the criminal history of Tika Smith.  Each of these arguments fails.

### A.  Legal Standard

Pursuant to Fed. R. Crim. P. 33(a), a district court may "vacate any judgment and grant a new trial if the interest of justice so requires."  "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  The defendant bears the burden of proving that he is entitled to a new trial.  *United States v. Hunter*, 32 F.4th 22, 30 (2d Cir. 2022).  "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).  "In other words, there must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate.  *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

B. <u>Sanctions</u>

First, the Court rejects Defendant's arguments that the Government's "repeated misbehavior," Def.'s Rule 33 Mem., ECF No. 275 at 3, and the Court's alleged failure to adequately sanction such misbehavior, is a basis for a new trial.

*1. Background*

On Thursday, October 23, 2024, Defendant cross-examined United States Citizenship and Immigration Services Officer William Balcerzak concerning the relationship between Defendant and his wife Tika Smith. Tr. at 213–16. In the Government's view, this line of questioning evinced a defense theory of third-party guilt. *See* ECF No. 278 at 29; *see also* Tr. at 623 (articulating that the Government contemplated calling Tika Smith as a rebuttal witness). As a result, that evening, the Government issued a trial Subpoena for Smith, to be served by FBI Special Agent Samuel Savage of the FBI's Newark field office. *See* Tr. at 646–47. Savage was unsuccessful in serving Smith personally, but was able to discuss the subpoena with her by phone on October 24. *See id.* at 647–52. Smith initially informed Savage that she did not want to appear at trial; in response, Savage informed her that she would be able to invoke spousal privilege in response to the subpoena. *See id.* at 653. The Government rested its case on the following day, Friday, October 25, and Defendant quickly followed suit without calling any witnesses. *See id.* at 592, 602.

On the morning of Monday, October 28, the Government informed the Court and Defendant that it had attempted to serve a subpoena on Smith and that she had declined to appear. *Id.* at 616–17. Defendant promptly moved for a mistrial because the Government had not informed him of this information until after he rested his case. *Id.* at 618. The Court denied the motion from the bench, concluding that it could cure whatever error there may have been from the Government's belated disclosure by allowing Defendant to re-open his case and question Agent

Savage.  *See id.* at 638 (citing *United States v. Burger*, 739 F.2d 805, 809–10 (2d Cir. 1984)).  The Court ordered that Agent Savage appear to testify, and the parties, the Court, and the jury waited as Savage drove from Newark, New Jersey, to the trial in Hartford.  *See id.* at 636, 640–43.  Defendant re-opened his case and then elicited testimony from Savage.  *Id.* at 644–60.  The Court instructed the jury that the Court had made the decision to allow Agent Savage to testify and that the jury should not hold the delay against any party.  *Id.* at 643–44.

In response to the Government's delayed disclosure, the Court noted that it would entertain proposals for sanctions.  *Id.* at 640.  After considering four different proposed sanctions advanced by Defendant, the Court ordered that the Government's closing argument rebuttal time be shortened from fifteen minutes to five minutes.  *Id.* at 664–71.

### 2.  Discussion

Defendant now moves for a new trial on the basis that the rebuttal time sanction imposed by the Court "is clearly insufficient."  ECF No. 275 at 7.  This motion fails.

First, Defendant fails to explain what exactly was inadequate about the Court's imposed sanction, which he himself had proposed.  This will not do, as Defendant bears the burden of proving that he is entitled to a new trial.  *Hunter*, 32 F.4th at 30.  Defendant baldly asserts that the Court's imposed sanction is "clearly insufficient" and "simply insufficient," ECF No. 275 at 7–8, but he fails to explain why that is the case.  Defendant also fails to squarely explain what alternative sanction would have been sufficient.  Perhaps Defendant may be construed as implying that dismissal of the indictment would be a sufficient sanction.  *See id.* at 7 (quoting a case discussing the "extreme sanction of dismissal").  But Defendant appears to admit that dismissal would be an "extreme sanction," and does not elaborate why dismissal, as opposed to a reduction in rebuttal time, is commensurate with the Government's actions.  *Id.*

More fundamentally, Defendant fails to articulate exactly how he was prejudiced by the Government's delayed disclosure of its attempt to subpoena Smith, much less how any such harm merits the drastic remedy of a new trial. Agent Savage was ultimately produced to be examined by Defendant, albeit on short notice. Defendant was given ample time to illicit Agent Savage's testimony as to the subpoena service attempts and the circumstances under which Agent Savage communicated with Smith, including his remarks about invocation of the spousal privilege. Defendant does not argue that he was precluded from any particular line of questioning. Nor does he argue that he was harmed by the lack of time in which to prepare to examine Agent Savage.

And to the extent Defendant could possibly be construed as arguing that he should have had the opportunity to call Smith as a witness himself, he could have subpoenaed Smith before trial. But he failed to list Smith as a witness at any point before trial, suggesting he had no intention of calling her as a witness. *See* ECF Nos. 66, 142, 232 (joint trial memoranda). Nor did he appear to make any attempts to subpoena Smith during trial.

Defendant's cursory argument that the Government improperly "coached" Smith "not to show up in court," ECF No. 275 at 3, also fails. When Smith informed Agent Savage that she did not want to attend trial, then and only then, did Agent Savage make any mention of the spousal privilege. *See* Tr. at 653. Thus, Defendant fails to identify any evidence showing that Smith was "coached" by the Government not to show up to trial. Defendant also fails to grapple with Government's argument that it, not Defendant, sought to subpoena Smith and that the Government would have had no reason to steer Smith away from complying with its own subpoena.

Defendant's vague attempt to connect the belated disclosure to the Government's "repeated misbehavior," ECF No. 275 at 3, does not provide enough for Defendant to carry his burden. As described above, the Court continued trial on the eve of trial twice, in no small part because of

16

belated disclosures from the Government.  Defendant twice moved to dismiss the indictment for the Government's actions and the Court denied both motions.  *See* ECF Nos. 138, 231.  While the Court in no way condones the Government's record of disclosure in this case, it notes that it has already dealt with the two previous disclosure incidents, namely either by continuing the trial or by denying Defendant's motions to dismiss the indictment.  The Court is mindful that the "ultimate test" for a motion for a new trial is "whether letting a guilty verdict stand would be a manifest injustice."  *Alston*, 899 F.3d at 146.  Defendant has failed to demonstrate what manifest injustice remains in light of the denied motions to dismiss the indictment and the sanctions this Court has exercised as to the very conduct Defendant has identified.

### C.  Tika Smith Criminal History

The Court also rejects Defendant's argument that its granting of the Government's motion to preclude Defendant's proffered Rule 404(b) evidence merits a new trial.

#### 1.  Background

At trial, counsel for Defendant expressed an intention to introduce evidence of Tika Smith's criminal history.  The Government opposed introduction of this evidence and filed a motion to preclude Defendant from cross-examining a Government witness about Smith's criminal history.  *See* Gov't Mot. to Preclude, ECF No. 238.  Tika Smith's convictions included a 2003 conviction for receiving stolen property; a 2004 conviction for drug-related charges; a 2006 conviction for drug-related charges; a 2007 conviction for theft by deception, receiving stolen property, and wrongful impersonation; and a 2009 conviction for prostitution.  *See id.* at 2–3; *see also* Def.'s Opp. Br., ECF No. 239.  The Court granted the Government's motion to preclude, applying the Second Circuit's "reverse 404(b)" caselaw and concluding evidence of Smith's criminal convictions was inadmissible for the purposes for which it would be offered.  *See* Order,

ECF No. 243. Defendant now argues that the Court's decision justifies the ordering of a new trial. ECF No. 275 at 8.

### 2. Discussion

As the Court recognized in its order denying Defendant's motion to introduce this evidence, *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984) provides the controlling framework within the Second Circuit for "reverse 404(b)" cases. *See* ECF No. 243. Under *Aboumoussallem*, when a defendant seeks to introduce other acts evidence of a third party, the standard is more relaxed than when the Government offers such evidence against a defendant. 726 F.2d at 911 ("[T]he standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword."). As part of this less restrictive standard, instead of analyzing whether the defendant has proffered evidence for a non-propensity purpose under Rule 404(b)(2), *see United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir. 1991), "the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense." *Aboumoussallem*, 726 F.2d at 912. If the evidence is relevant, a court may engage in a Rule 403 balancing analysis to determine if it should be admitted. *Id.* Notably, when carrying out this analysis, "risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense," *id.* at 911, but a court may also assess the other Rule 403 factors, such as whether the probative value of the evidence is substantially outweighed by the risks of confusion of the issues, misleading the jury, delay, wasting time, or presentation of cumulative evidence. *Id.* at 911–12.

Here, although Second Circuit law may not require a finding of a non-propensity purpose, the Court concludes, again, that Defendant adequately proffered the non-propensity purpose of

identity, as he sought to introduce the evidence to suggest that someone else—his wife—committed the charged crimes.  While Defendant also argues that the non-propensity purpose of opportunity applied, *see* ECF No. 275 at 10, the Court disagrees.  The conduct underlying Smith's convictions took place well before the conduct alleged in the indictment and Defendant offered no reason to believe the conduct underlying those convictions had anything to do with the conduct alleged in the indictment.[3]  Therefore, the proffered criminal history in no way made it more or less likely that Smith had the *opportunity* to commit the crime with which Defendant was charged here; that is, the criminal records did not speak to whether she had access to the relevant accounts or any other similar opportunity to carry out the conduct alleged in the indictment.

Nonetheless, the Court concludes, as it did during trial, that the proffered evidence was inadmissible under Rule 403.  The proffered convictions cover a wide variety of criminal activity, including drug use and prostitution, which plainly are not relevant to the allegations of wire fraud. The most probative convictions are 2007 convictions for theft by deception in the third degree, receiving stolen property in the third degree, and wrongful impersonating in the third degree, for which Smith was arrested in May of 2006.  ECF No. 238 at 3.  But these actions are remote in time from the charged offenses, having occurred at least ten years before the alleged conduct charged in the indictment.  Moreover, Defendant failed to proffer information about the facts underlying the convictions, including whether they involved online fraud, like the charged offenses.  Indeed, the information the parties presented before the Court related only to the date of conviction, statute violated, and sentence.  *See* Tr. at 480–81; ECF Nos. 238, 239; *see also* Tr. at 616 (representing government counsel had rerun a search in the National Crime Information Center database for Smith and found no further information).  The proffered evidence, thus, had a high likelihood of

---

[3] Further, as described below, neither party provided information about the specific conduct that led to the convictions.

confusing the issues and misleading the jury.

At its core, without any information linking the similarity of Smith's actions to the charged offenses, Defendant's theory of relevance of these convictions remains actually one of propensity: because Ms. Smith committed fraud-adjacent crimes in the past, she—rather than Defendant—is likely to have committed the charged fraud alleged in the indictment.   One of the main cases on which Defendant relies, *United States v. Johnson*, 729 F.3d 710 (7th Cir. 2013), actually cuts against Defendant's arguments and highlights this point.   In that case, the Seventh Circuit concluded that "the only serious objection to [reverse 404(b)] evidence is that its probative value is slight, as it may just amount to pointing a finger at someone else who, having a criminal record, might have committed the crime the defendant is accused of committing."  729 F.3d at 716.  That is precisely what the Court was presented with in this case—evidence of Smith's criminal history would have been introduced simply to point a finger at someone other than the Defendant to suggest she may have committed the crime.  Accordingly, the probative value of the proffered evidence was substantially outweighed by the danger of confusing the issues and misleading the jury.

Additionally, the Court rejects Defendant's argument that the proffered convictions were not too remote to be considered.  As an initial matter, Defendant, in relying exclusively on out-of-circuit precedent, fails to identify any controlling decisions in this circuit that suggest the Court erred in concluding that the 2007 convictions were remote in relation to the 2018 conduct alleged in the indictment.  And even analyzing the Eight Circuit case Defendant cites, that case notes that "[t]here is no fixed period within which the prior acts must have occurred," and further notes that the Eight Circuit has been "reluctant" to affirm the introduction of other acts or crimes more than thirteen years older than the conduct alleged.  *United States v. Harry*, 930 F.3d 1000, 1007 (8th

20

Cir. 2019). *Harry* upheld the exclusion of bad acts that occurred between fourteen and seventeen years before the relevant period and, therefore, fails to speak to whether the eleven- to twelve-year difference here cannot, as a matter of law, be too remote.

Moreover, while Defendant's motion expresses disagreement with the Court's granting of the Government's motion to preclude, Defendant fails to argue how the Court's ruling justifies the ordering of a new trial under the relevant legal standard. In light of all of the above analysis, Defendant has failed to establish a "real concern that an innocent person may have been convicted." *Snype*, 441 F.3d at 140.

## IV.    CONCLUSION

For the reasons described above, Defendant Alorwornu's motion for a judgment of acquittal and motion for a new trial are both DENIED. The Court will enter an order for a presentence investigation and set a sentencing date.

**SO ORDERED** at Hartford, Connecticut, this 22nd day of July, 2025.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE